# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| YVENS SAINT-PHARD, derivatively on behalf of SOLARIS ENERGY INFRASTRUCTURE, INC., | Case No: |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| WILLIAM A. ZARTLER, KYLE S. RAMACHANDRAN, LAURIE H. ARGO, JAMES R. BURKE, CYNTHIA M. DURRETT, EDGAR R. GIESINGER, W. HOWARD KEENAN, JR., A. JAMES TEAGUE, and RAY N. WALKER, JR., | |
| Defendants, | |
| and | |
| SOLARIS ENERGY INFRASTRUCTURE, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Yvens Saint-Phard ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Solaris Energy Infrastructure, Inc. ("Solaris" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants William A. Zartler ("Zartler"), Kyle S. Ramachandran ("Ramachandran"), Laurie H. Argo ("Argo"), James R. Burke ("Burke"), Cynthia M. Durrett ("Durrett"), Edgar R. Giesinger ("Giesinger"), W. Howard Keenan, Jr. ("Keenan"), A. James Teague ("Teague"), and Ray N. Walker, Jr.

("Walker")(collectively, the "Individual Defendants," and together with Solaris, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of their fiduciary duties as directors and/or officers of Solaris, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution against Defendants Zartler and Ramachandran under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Solaris, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from July 9, 2024 to March 17, 2025, both dates inclusive (the "Relevant Period").

2.    Solaris is a Houston-based company which provides mobile and scalable equipment-based solutions for use in power generation as well as the management of raw materials used in the completion of oil and natural gas wells. Solaris operates throughout the U.S. and serves the energy, data center, and other commercial and industrial sectors.

- 2 -

3.     Solaris is currently divided into two operating segments: Solaris Power Solutions and Solaris Logistics Solutions. Solaris Power Solutions provides mobile power generation solutions through equipment lease agreements. Solaris Logistics Solutions designs and manufactures specialized equipment, which combined with field technician support, logistics and software solutions, which enables the Company to drive efficiencies and reduce operational footprint for oil and natural gas operators.

4.     On July 9, 2024, the Company issued a press release announcing it had entered into an agreement to acquire a turbine leasing company called Mobile Energy Rentals LLC ("MER") (the "July 9 Press Release"). The July 9 Press Release touted the MER acquisition, describing MER as a "*premier provider of distributed power solutions serving the energy and commercial & industrial end-markets," primarily engaged in the leasing of "natural-gas powered mobile turbines*." [1] The acquisition closed on September 11, 2024 and the Company rebranded MER to Solaris Power Solutions.

5.     Throughout the Relevant Period, the Individual Defendants touted the MER acquisition as providing a valuable growth opportunity for Solaris. For instance, on March 5, 2025, the Company filed its Form 10-K to the SEC for the 2024 fiscal year (the "2024 Form 10-K"), which described the MER acquisition as providing Solaris "with an entry into the large and growing distributed power solutions market, both enhancing our position as a mobile equipment and logistics solution provider to the oil and gas industry and also diversifying our end market exposure."

6.     The truth began to emerge on March 17, 2025, when Morpheus Research issued a

---

[1] Unless otherwise stated, all emphasis herein is added.

report titled "Solaris Energy Infrastructure: How A Crumbling Texas Oilfield Services Company Gambled It All On A Convicted Felon And The World's Richest Man" (the "Morpheus Research Report"). The Morpheus Research Report revealed that MER's track record and experience in the turbine-leasing space were overstated, and in fact MER had only just acquired its turbines in the months prior to the acquisition. The Morpheus Research Report further revealed that despites assurances from Defendant Zartler that he had known MER's management was a "cultural and operational fit" and the businesses were "highly complementary," John Tuma ("Tuma"), one of MER's co-owners, was embroiled in multiple controversies, including turbine related fraud and a felony conviction for environmental crimes. Additionally, the Morpheus Research Report detailed how despite assurances to investors that MER had a "contracted and diversified earnings stream[,]" 96% of MER's revenues came from just one client.

7.       On this news, the price per share of Solaris' stock fell $4.15, or 16.9%, from a closing price of $24.61 per share on March 14, 2025 to close at a price of $20.46 per share on March 17, 2025.

8.       During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) MER's experience and track record in the turbine leasing sector were overstated; (2) one of MER's co-owners was embroiled in numerous controversies, including turbine-related fraud and a felony conviction for environmental crimes; (3) MER's minimal clientele limited its value proposition to

- 4 -

Solaris; (4) as a result, Solaris overstated the commercial prospects of the MER acquisition; and (5) Solaris overstated its total assets and near term profitability on its financial reports due to the failure to properly deprecate MER's turbines in accordance with industry standards. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

9.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Solaris to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between November 2024 and March 2025, 300,197 shares of Solaris common stock were repurchased at artificially inflated prices, costing the Company approximately $10.2 million. As the Company's stock was actually only worth $20.46 per share, the price at which it was trading when markets closed on March 17, 2025, the Company overpaid for repurchases of its own stock by approximately $4 million in total.

10.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while four of the Individual Defendants engaged in improper sales, netting proceeds of over *$27.9 million*.

11.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Co-Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO") to a federal securities class action lawsuit pending in the United States District Court for the Southern District of Texas (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from

the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Zartler and Ramachandran's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

18.     Plaintiff is a current shareholder of Solaris. Plaintiff has continuously held Solaris common stock at all relevant times.

**Nominal Defendant Solaris**

19.     Nominal Defendant Solaris is a Delaware corporation with its principal executive offices at 9651 Katy Freeway, Suite 300, Houston, Texas 770024. Solaris' common stock trades on the Nasdaq Capital Market ("NASDAQ") under ticker symbol "SEI."

**Defendant Zartler**

20.     Defendant Zartler served as the Company's CEO from October 2017 to October 2025 and currently serves as the Solaris' Co-CEO. Defendant Zartler has also served as a Company director since October 2017.

21.     During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Zartler made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds |
|------|------------------|----------------------|----------|
| March 1, 2025 | 81,114 | $34.15 | $2,770,043 |

Thus, in total, before the fraud was exposed, Defendant Zartler sold 81,114 shares of Company common stock on inside information, for which he received approximately $2,770,043 in total

proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in participating in the scheme.

22.    The Schedule 14A the Company filed with the SEC on April 4, 2025 (the "2025 Proxy Statement") stated the following about Defendant Zartler:

> William A. Zartler is our Chairman and has served as a member of the Board since February 2017 and a manager of our predecessor since October 2014. Mr. Zartler was also appointed Chief Executive Officer by the Board in July 2018. Mr. Zartler founded Loadcraft Site Services, LLC and served as its Executive Chairman from February 2014 to September 2014. Mr. Zartler served as our predecessor's Chief Executive Officer and Chairman from October 2014 through our IPO in May 2017. Mr. Zartler also currently serves as Executive Chairman of Aris Water Solutions, Inc. ("ARIS") (NYSE: ARIS), a role he has held since its initial public offering in October 2021, and previously served as Chairman and Chief Executive Officer of the predecessor to ARIS from its inception in 2014 through its initial public offering in October 2021. Mr. Zartler has extensive experience in both energy industry investing and managing growth businesses. Prior to founding our predecessor, in January 2013 Mr. Zartler founded Solaris Energy Capital, LLC, a private investment firm focused on investing in and managing emerging, high growth potential businesses primarily in midstream energy and oilfield services, including Solaris LLC, and Mr. Zartler continues to serve as the sole member and manager of Solaris Energy Capital, LLC, a related party of the Company. Prior to founding Solaris Energy Capital, LLC, Mr. Zartler was a founder and Managing Partner of Denham Capital Management ("Denham"), a $7 billion global energy and commodities private equity firm, from its inception in 2004 to January 2013. Mr. Zartler led Denham's global investing activity in the midstream and oilfield services sectors and served on the firm's Investment and Executive Committees. Previously, Mr. Zartler held the role of Senior Vice President and General Manager at Dynegy Inc., building and managing the natural gas liquids business.

**Defendant Ramachandran**

23.    Defendant Ramachandran has served as the Company's CFO since 2017.

24.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Ramachandran made the following sales of Company's common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds |
|------|------------------|----------------------|----------|
| March 1, 2025 | 33,277 | $34.15 | $1,136,410 |

Thus, in total, before the fraud was exposed, Defendant Ramachandran sold 33,277 shares of Company common stock on inside information, for which he received approximately $1,136,410 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in participating in the scheme.

25.    The 2025 Proxy Statement stated the following about Defendant Ramachandran:

Kyle S. Ramachandran joined Solaris at its founding in 2014, was named Chief Financial Officer in 2017 and President in 2018. Prior to joining Solaris, Mr. Ramachandran was a member of the Barra Energia management team, an independent exploration and production company based in Rio de Janeiro, Brazil. Mr. Ramachandran was previously an investor at First Reserve Corporation, a global energy-focused private equity firm. Mr. Ramachandran began his career as an investment banker in the Mergers & Acquisitions Group at Citigroup. Mr. Ramachandran received a Bachelor of Science in Finance and Accounting from the Carroll School of Management Honors Program at Boston College, where he graduated cum laude. Mr. Ramachandran is a member of the Board of Regents of Boston College.

**Defendant Argo**

26.    Defendant Argo has served as a Company director since March 2022. She also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee and the Compensation Committee.

27.    The 2025 Proxy Statement stated the following about Defendant Argo:

Laurie H. Argo has served as a member of the Board since March 2022 and currently serves as a member of our Audit Committee and as Chairperson of our Nominating and Governance Committee. Since January 1, 2023, Ms. additionally currently serves on the board of directors of the general partner of Viper Energy, Inc. (NASDAQ: VNOM). Previously, Ms. Argo served on the board of the general

partner of Rattler Midstream LP (f/k/a NASDAQ: RTLR) ("Rattler") where she served as a member on both the Audit and Conflicts Committees, from May 2019 until August 2023, at which time Rattler was acquired by Diamondback Energy, Inc (NASDAQ: FANG). From August 2018 through June 2021, Ms. Argo served as a director on the board of EVRAZ plc, a multinational, vertically integrated steel making and mining company and was a member of both its Audit and Remuneration Committees. Since October 2017, Ms. Argo has performed consulting services for clients within the energy industry. From January 2015 until September 2017, Ms. Argo served as Senior Vice President of Enterprise Products Holdings LLC, the general partner of Enterprise Products Partners L.P. (NYSE: EPD) ("Enterprise LP"), a midstream natural gas and crude oil pipeline company. From October 2014 to February 2015, Ms. Argo served as President and Chief Executive Officer of OTLP GP, LLC, the general partner of Oiltanking Partners, L.P., an affiliate of Enterprise LP. From January 2014 to January 2015, Ms. Argo was Vice President, NGL Fractionation, Storage and Unregulated Pipelines of Enterprise LP. From 2005 to January 2014, Mr. Argo held various positions in the NGL and Natural Gas Processing businesses for Enterprise LP, where her responsibilities included the commercial and financial management of four joint venture companies. From 2001 to 2004, Ms. Argo worked for San Diego Gas and Electric Company in San Diego, California and PG&E Gas Transmission, a subsidiary of PG&E Corporation (NYSE: PCG), in Houston, Texas from 1997 to 2000. Ms. Argo earned an Masters of Business Administration from National University in La Jolla, California and graduated from St. Edward's University in Austin, Texas with a degree in accounting. Ms. Argo has over 25 years of experience in the energy industry and maintains multiple organizational memberships including the National Association of Corporate Directors ("NACD").

Ms. Argo has broad knowledge of the energy industry and significant financial and accounting experience as a director on the boards and committees of numerous companies, including audit committees of numerous public companies. We believe her skills and experience qualify her to serve as a member of the Board.

**Defendant Burke**

28.    Defendant Burke served as a Company director since May 2017. He also serves as a member of the Nominating and Governance Committee.

29.    The 2025 Proxy Statement stated the following about Defendant Burke:

James R. Burke has served as a member of the Board since May 2017 and served as a manager of our predecessor from October 2014 to May 2017 and currently serves as a member of our Nominating and Governance Committee. From July

2013 until January 2018 Mr. Burke served on the board of Centurion, a private equity sponsored oilfield services company based in Aberdeen, Scotland. Mr. Burke served as the Chief Executive Officer and President of Forum Energy Technologies ("Forum") from May 2005 to October 2007 and as Chairman of Forum from 2007 to 2010. Mr. Burke retired from his position as Chairman of Forum in 2010, subsequent to which he evaluated potential opportunities prior to becoming a director of Centurion. Prior to joining Forum, Mr. Burke served as Chief Executive Officer of Access Oil Tools Inc. ("Access") from April 2000 to May 2005. Before joining Access, Mr. Burke held various positions with Weatherford International Ltd. ("Weatherford") from January 1991 to August 1999, including Executive Vice President responsible for all manufacturing operations and engineering at its Compressor Division. Prior to joining Weatherford, Mr. Burke was employed by Cameron Iron Works ("Cameron") from 1967 to 1989, where he held positions of increasing seniority, including Vice President of Cameron's Ball Valve division. Mr. Burke holds a Bachelor of Science in Electrical Engineering from University College, Dublin, Ireland, and a Master of Business Administration from Harvard University.

Mr. Burke has broad knowledge of the energy industry and significant operating experience. We believe his skills and industry experience qualify him to serve as a member of the Board.

**Defendant Durrett**

30.    Defendant Durrett has served as a Company director since March 2019 and as the Company's Chief Administrative Officer since March 2017.

31.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Durrett made the following sales of Company's common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| March 1, 2025 | 16,182 | $34.15 | $552,615 |

Thus, in total, before the fraud was exposed, Defendant Durrett sold 16,182 shares of Company common stock on inside information, for which she received approximately $552,615 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed demonstrate her motive in participating in the scheme.

32.    The 2025 Proxy Statement stated the following about Defendant Durrett:

Cynthia M. Durrett has served as a member of the Board since March 2019 and as our Chief Administrative Officer since March 2017. Ms. Durrett was previously our Vice President of Business Operations from October 2014 to February 2017 and the Vice President of Business Operations of Solaris Energy Capital, LLC from October 2013 to September 2014, a related party of the Company. From July 2013 to September 2013, Ms. Durrett served as an independent consultant in the proppant industry. From 2007 to June 2013, Ms. Durrett was the Director of Business Planning and Capital Projects for Cadre Proppants. Ms. Durrett previously served as Managing Director of Dynegy Midstream Services, where she provided leadership to several sectors of the organization including information technology, regulated energy delivery, natural gas liquids and midstream. Ms. Durrett began her career at Ferrell North America, where she managed operations for the energy commodities trading business, including natural gas liquids and refined products. Ms. Durrett received a Bachelor of Science in Business Administration from Park University in Kansas City, Missouri, where she graduated with distinction.

Ms. Durrett's extensive operational knowledge and experience in the energy industry makes her well suited to serve as a member of our Board.

**Defendant Giesinger**

33.    Defendant Giesinger has served as a Company director since May 2017. He also currently serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee.

34.    The 2025 Proxy Statement stated the following about Defendant Giesinger:

Edgar R. Giesinger has served as a member of the Board since May 2017 and currently serves as a member of our Nominating and Governance Committee and as Chairman of our Audit Committee. Mr. Giesinger retired as a managing partner from KPMG LLP in 2015. Since November 2015, Mr. Giesinger has served on the board of directors of Geospace Technologies Corporation (NASDAQ: GEOS), a publicly traded company primarily involved in the design and manufacture of instruments and equipment utilized in oil and gas industries. Mr. Giesinger served on the board of directors of Newfield Exploration Company, a publicly traded crude oil and natural gas exploration and production company, from August 2017 until

February 2019 when it was sold to Encana Corporation. He has 35 years of accounting and finance experience working mainly with publicly traded corporations. Over the years, he has advised a number of clients in accounting and financial matters, capital raising, international expansions and in dealings with the SEC. While working with companies in a variety of industries, his primary focus has been energy and manufacturing clients. Mr. Giesinger is a certified public accountant in the State of Texas. He has lectured and led seminars on various topics dealing with financial risks, controls and financial reporting.

We believe that Mr. Giesinger's extensive financial and accounting experience, including that related to the energy and manufacturing industries, qualifies him to effectively serve as a member of the Board.

**Defendant Keenan**

35.    Defendant Keenan has served as a Company director since May 2017.

36.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Keenan made the following sales of Company's common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| December 16, 2024 | 975,000 | $24.01 | $23,409,750 |

Thus, in total, before the fraud was exposed, Defendant Keenan sold 975,000 shares of Company common stock on inside information, for which he received approximately $23,409,750 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in participating in the scheme.

37.    The 2025 Proxy Statement stated the following about Defendant Keenan:

W. Howard Keenan, Jr. has served as a member of the Board since May 2017 and served as a manager of our predecessor from November 2014 to May 2017. Mr. Keenan has over 45 years of experience in the financial and energy businesses. Since

1997, he has been a Member of Yorktown Partners LLC, a private investment manager focused on the energy industry. From 1975 to 1997, he was in the Corporate Finance Department of Dillon, Read & Co. Inc. and active in the private equity and energy areas, including the founding of the first Yorktown Partners fund in 1991. Mr. Keenan also serves on the boards of directors of the following public companies: Antero Resources Corporation (NYSE: AR), Antero Midstream Corporation (NYSE: AM) and Aris Water Solutions, Inc. (NYSE: ARIS). In addition, he is currently serving, and has previously served, as a director of multiple Yorktown Partners portfolio companies. Mr. Keenan holds a Bachelor of Arts degree cum laude from Harvard College and a Master of Business Administration from Harvard University.

Mr. Keenan has broad knowledge of the energy industry and significant experience with energy companies. We believe his skills and background qualify him to serve as a member of the Board.

### Defendant Teague

38.    Defendant Teague has served as a Company director since May 2017. He also serves as a member of the Compensation Committee.

39.    The 2025 Proxy Statement stated the following about Defendant Teague:

A. James Teague has served as a member of the Board since May 2017 and currently serves as a member of our Compensation Committee. Mr. Teague has served as the Co-Chief Executive Officer of Enterprise Products Holdings LLC ("Enterprise") since January 2020, has been a Director of Enterprise since July 2008 and serves as Co-Chairman of the Capital Projects Committee of Enterprise since November 2016. Mr. Teague previously served as the Chief Executive Officer of Enterprise from January 2016 to January 2020, Chief Operating Officer of Enterprise from November 2010 to December 2015 and served as an Executive Vice President of Enterprise from November 2010 until February 2013. Mr. Teague joined Enterprise in connection with its purchase of certain midstream energy assets from affiliates of Shell Oil Company in 1999. From 1998 to 1999, Mr. Teague served as President of Tejas Natural Gas Liquids, LLC, then an affiliate of Shell. From 1997 to 1998, he was President of Marketing and Trading for MAPCO, Inc. Prior to 1997 he spent 22 years with Dow Inc. (NYSE: DOW) in various roles including Vice President, Hydrocarbon Feedstocks.

Mr. Teague has broad knowledge of the energy industry and significant operating experience. We believe his skills and industry experience qualify him to serve as a member of the Board.

### Defendant Walker

40.     Defendant Walker has served as a Company director since August 2018. He also serves as the Chair of the Compensation Committee.

41.     The 2025 Proxy Statement stated the following about Defendant Walker:

Ray N. Walker, Jr. has served as a member of the Board since August 2018 and currently serves as a member of our Compensation Committee. Mr. Walker has served as the Chief Operating Officer of Encino Energy, a private oil and gas acquisition and development company, since September 2018. Mr. Walker retired as executive vice president and chief operating officer of Range Resources Corporation ("Range Resources") (NYSE: RRC) in April 2018. Range Resources is a publicly traded, independent natural gas, natural gas liquids and oil company engaged in the exploration, development and acquisition of natural gas and crude oil properties. Mr. Walker joined Range Resources in 2006 and was elected to the role of executive vice president and chief operating officer in January 2014. Previously, Mr. Walker served as Senior Vice President – Chief Operating Officer, Senior Vice President-Environment, Safety and Regulatory and Senior Vice President-Marcellus Shale for Range Resources where he led the development of Range Resources' Marcellus Shale division. Mr. Walker is a petroleum engineer with more than 45 years of oil and gas operations and management experience having previously been employed by Halliburton Company (NYSE: HAL) in various technical and management roles, Union Pacific Resources Group, Inc. and several private companies in which Mr. Walker served as an officer. Mr. Walker holds a Bachelor of Science degree in Agricultural Engineering with honors from Texas A&M University.

Mr. Walker has broad knowledge of the energy industry and significant operating experience. We believe his skills and industry experience qualify him to serve as a member of the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders

so as to benefit all shareholders equally.

43.    Each director and/or officer of the Company owes to Solaris and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

45.    To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

46.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants at Solaris had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

47.    To discharge their duties, the officers and/or directors of the Company were

required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Solaris' own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the

Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

48.    Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

49.    At all times relevant hereto, the Individual Defendants at Solaris were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

50.    Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

51.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

54. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of Solaris' board of directors, each of the Individual Defendants who was a director of Solaris was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55. Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

56.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## SOLARIS' CODE OF CONDUCT

57.    Solaris' Code of Conduct provides "basic principles and guidelines to assist directors, officers and employees of the Company and any of its subsidiaries and affiliates (collectively, "Solaris") in complying with the legal and ethical requirements governing Solaris's business conduct."

58.    Under the heading "Statement of Principles," under the subheading "Basic Standards," the Code of Conduct states:

> Solaris's fundamental policy is to conduct its business with honesty and integrity in accordance with the highest legal and ethical standards. Solaris and its directors, officers and employees must comply with all applicable legal requirements of the United States and each other country in which Solaris conducts business.

59.    Under the same heading, under the subheading "Individual Responsibility and Compliance," the Code of Conduct states:

> This Code provides guidance for specific situations that may arise. However, each director, officer, and employee has the responsibility to exercise good judgment to act in a manner that will reflect favorably upon Solaris and the individual.

Directors, officers and employees must comply with the spirit as well as the letter of this Code. Directors, officers and employees must not attempt to achieve indirectly, through the use of agents or other intermediaries, what is prohibited directly by this Code.

60.　Under the heading "Implementation," under the subheading "Condition of Director Appointment/Election," the Code of Conduct states:

Each director must become familiar with and agree to comply with this Code. All directors will be provided with a copy of this Code at the time of their appointment or election to serve on the Board.

61.　Under the same heading, under the subheading "Violation of Policy," the Code of Conduct states:

Compliance with this Code is essential. Violations will result in disciplinary action, including dismissal of any officer or other employee where warranted.

62.　Under the heading "Conflicts of Interest," under the subheading "General," the Code of Conduct states in relevant part:

Directors, officers, and employees must conduct themselves in a manner which promotes the best interests of Solaris and must avoid actual and potential conflicts of interest or any circumstance that could raise even the appearance of impropriety.

A conflict of interest occurs when an individual's private interest interferes in any way with the interests of Solaris. This situation can arise when a director, officer or employee takes actions or has interests that may make it difficult to perform his or her work objectively and effectively. Conflicts of interest also arise when a director, officer or employee, or a member of such person's family or household, receives improper personal benefits as a result of the director's, officer's or employee's position with Solaris. A conflict of interest is deemed to exist whenever, as a result of the nature or responsibilities of his or her relationship with Solaris, a director, officer or employee is in a position to further any personal financial interest or the financial interest of any member of such person's family.

During the period that they are employed or otherwise engaged by Solaris, directors, officers, and employees must not accept employment with, become directly or indirectly involved in, or otherwise work for any competitor of Solaris or in any other capacity where their skills and actions may be applied to the disadvantage of Solaris. Likewise, directors, officers, and employees must not, for

themselves or a competitor, solicit the suppliers, vendors, or other contractors of Solaris for services similar to or competitive with those provided or offered by Solaris at any time during their employment or engagement by Solaris.

While it is not possible to describe all circumstances where a conflict of interest involving a director, officer or employee exists or may exist, the following situations may involve actual or potential conflicts of interest:

• Having an interest in, or position with, any supplier, vendor, contractor or competitor of Solaris (except for an investment in publicly traded securities as described below).

• The acceptance of gifts or favors of more than nominal value by a director, officer or employee (or a member of such person's immediate family) from an actual or prospective supplier, vendor, contractor or competitor of Solaris or any governmental official or employee. This does not preclude the acceptance by a director, officer or employee of reasonable business entertainment (such as a lunch or dinner or events involving normal sales promotion, advertising or publicity).

• Acceptance of personal fees or commissions in connection with Solaris transactions or conducting transactions on behalf of Solaris with any third party in a manner which results in personal benefit or gain to the director, officer, or employee.

• The disclosure or use of confidential information gained by reason of employment with Solaris (or, in the case of a director, election or appointment to the Board) for profit or advantage by a director, officer or employee or anyone else.

• Competition with Solaris in the acquisition or disposition of rights or property.

***

These examples are given only to guide directors, officers and employees in making judgments about conflicts of interest. If any director, officer or employee finds himself or herself in a situation where a conflict of interest exists or may exist, he or she should immediately report the matter as provided below in Section III. C.

63.    Under the same heading, under the subheading "Reporting Conflicts of Interest Involving Directors or Officers," the Code of Conduct states:

An actual or potential conflict of interest involving a director or officer, or a member of such person's immediate family, must be reported by the affected person

(or by others having knowledge of the existence of the actual or potential conflict of interest) to the Company's Chief Administrative Officer or General Counsel, as applicable, who shall promptly disclose the possible conflict of interest to the Board at the earliest time practicable under the circumstances. The Board will determine whether the possible conflict of interest indeed constitutes a conflict of interest.

The Board's approval will be required prior to the consummation of any proposed transaction or arrangement that is determined by the Board to constitute a conflict of interest. Any member of the Board or any officer having a possible conflict of interest in any proposed transaction or arrangement is not permitted to vote (in the case of a member of the Board) or use his or her personal influence on the matter being considered by the Board. Any member of the Board having a possible conflict of interest is not counted in determining the quorum for consideration and vote on the particular matter. Finally, any member of the Board or any officer having a possible conflict of interest must be excused from any meeting of the Board during discussion (subject to the exception set forth in the paragraph below) and vote on the particular matter (in the case of an interested director). The minutes of the Board meeting should reflect the absence from the meeting of the interested director or officer, the abstention from voting (in the case of an interested director) and the presence of a quorum. The proposed transaction or arrangement is considered approved if it receives the affirmative vote of a majority of the disinterested members of the Board (even though the disinterested members are less than a quorum).

The foregoing requirements do not prohibit the interested director or officer from briefly stating his or her position on the matter or from answering pertinent questions of the disinterested members of the Board, as the interested director's knowledge may be of assistance to the other Board members in their consideration of the matter.

64.     Under the heading "Record Keeping," under the subheading "Solaris Books and Records," the Code of Conduct states:

Books and Records. Solaris requires honest and accurate recording and reporting of information in order to make responsible business decisions. As such, Solaris's books, records and accounts must accurately and fairly reflect Solaris's transactions in reasonable detail and in accordance with Solaris's accounting practices and policies. The following examples are given for purposes of illustration and are not intended to limit the generality of the foregoing in any way:

• No false or deliberately inaccurate entries (such as overbilling or advance billing) are permitted. Discounts, rebates, credits and allowances do not constitute

overbilling when lawfully granted. The reasons for the grant should generally be set forth in Solaris's records, including the party requesting the treatment.

• No payment shall be made with the intention or understanding that all or any part of it is to be used for any person other than that described by the documents supporting the payment.

• No undisclosed, unrecorded or "off-book" funds or assets are permitted.

• No false or misleading statements, written or oral, shall be intentionally made to any internal accountant or auditor or Solaris's independent registered public accounting firm with respect to Solaris's financial statements or documents to be filed with the Securities and Exchange Commission (the "SEC") or other governmental authority.

<u>Internal Accounting Controls</u>. The principal executive officer and principal financial officer of the Company and each of its subsidiaries and affiliates are responsible for implementing and maintaining a system of internal accounting controls sufficient to provide reasonable assurances that:

• Transactions are executed in accordance with management's general or specific authorization;

• Transactions are recorded as necessary to: (a) permit the preparation of financial statements in conformity with generally accepted accounting principles or any other applicable criteria and (b) maintain accountability for assets;

• Access to assets is permitted only in accordance with management's general or specific authorization; and

• The recorded accountability of assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

<u>Employee Conduct.</u> No director, officer or other employee of Solaris is permitted to willfully, directly or indirectly:

• Falsify, or cause to be falsified, any book, record or account of Solaris;

• Make, or cause to be made, any materially false or misleading statement or omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which the statements were made, not misleading to an accountant in connection with (a) any audit or examination of Solaris's financial statements or (b) the preparation or filing of any

document or report required to be filed by Solaris with the SEC or other governmental agency; or

• Take any action to fraudulently influence, coerce, manipulate or mislead Solaris's independent registered public accounting firm.

Directors, officers and employees must exercise reasonable due diligence in order to avoid the events described above. If an employee believes that Solaris's books and records are not being maintained in accordance with these requirements, the employee should contact his or her supervisor, a member of Human Resources Management, or the Company's Chief Administrative Officer or General Counsel, as appropriate.

65.    Under the heading "Use of Company Property and Resources," under the

subheading "Protection and Proper Use of Company Assets," the Code of Conduct states:

The use of any Solaris funds or assets for any unlawful or improper purpose is prohibited. All directors, officers, and employees should endeavor to protect Solaris's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on Solaris's profitability. Any suspected incident of fraud or theft should be reported immediately for investigation. Solaris equipment should not be used for non-business related purposes, though incidental personal use may be permitted (such as occasional use of Solaris's supplies, copying facilities or telephone when the cost to Solaris is insignificant).

The obligation of directors, officers, and employees to protect Solaris's assets includes an obligation to protect Solaris's confidential and proprietary information, which is addressed in Section VI. C.

66.    Under the heading "Business and Trade Practices," under the subheading

"Compliance with Laws, Rules, and Regulations," the Code of Conduct states in relevant part:

Compliance with Laws. Obeying the law, both in letter and in spirit, is the foundation upon which Solaris's ethical standards are built. All directors, officers and employees must respect and obey the laws of the cities, states and countries in which Solaris operates. Although directors, officers and employees are not expected to know every law that is applicable to Solaris, it is important that directors, officers and employees know enough to ask questions and seek advice from supervisors, managers, lawyers or other appropriate personnel if they have any doubt regarding the legality of an action taken, or not taken, on behalf of Solaris.

Insider Trading. Purchasing or selling, whether directly or indirectly, the Company's securities while in possession of material non-public information is both unethical and illegal. Directors, officers and employees also are prohibited by law from disclosing material non-public information to others who might use the information to directly or indirectly place trades in the Company's securities. Directors, officers and employees also shall not recommend the purchase or sale of the Company's securities. All directors, officers and employees shall comply with the Company's Insider Trading Policy.

67.    Under the heading "Preparation and Certification of 1934 Act Reports," under the

subheading "Internal Control Report," the Code of Conduct states:

Once required, the Company's Annual Report on Form 10-K shall contain an internal control report that (1) states the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting; (2) contains an assessment, as of the end of the Company's most recent fiscal year, of the effectiveness of the Company's internal control structure and procedures for financial reporting; (3) includes a statement that the Company's independent registered public accounting firm has issued a report on the Company's internal controls and procedures for financial reporting; (4) includes the report of the Company's independent registered public accounting firm; and (5) otherwise complies with Section 404 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder by the SEC.

68.    Under the same heading, under the subheading "Disclosure Controls," the Code of

Conduct states:

It is the Company's policy to promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company.

69.    Under the heading "Reporting Violations," the Code of Conduct states:

Solaris encourages and promotes ethical behavior.

Directors, officers and employees should report violations of applicable laws, rules and regulations (including, without limitation, the listing requirements of the New York Stock Exchange ("NYSE")), this Code or any other code, policy or procedure of Solaris to the individual's supervisor, a member of Human Resources Management, or the Company's Chief Administrative Officer or General Counsel, as appropriate.

Directors, officers and employees are expected to cooperate in internal investigations of misconduct.

70.    Under the heading "Waivers of this Code," the Code of Conduct States:

Any waiver of a provision of this Code may be made only by the Board or a committee thereof. Any waiver for directors or executive officers will be promptly disclosed if and as required by law and the listing requirements of the NYSE.

71.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

## SOLARIS' AUDIT COMMITTEE CHARTER

72.    The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to:

A. Assist the Board in fulfilling its oversight responsibilities regarding the:

• Integrity of the Company's financial statements;

• Company's compliance with legal and regulatory requirements;

• Qualifications, independence and performance of the independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "independent registered public accounting firm"); and

• Effectiveness and performance of the Company's internal audit function;

B. Annually, prepare an Audit Committee Report and publish the report in the Company's proxy statement for its annual meetings of stockholders, in accordance with applicable rules and regulations; and

C. Perform such other functions as the Board may assign to the Committee from time to time.

73.     Under the heading "Authority and Responsibility," under the subheading "Authority," the Code of Conduct states in relevant part:

The Committee has the authority to:

1. Conduct or authorize investigations into any matter, including, but not limited to, complaints relating to accounting, internal accounting controls or auditing matters, within the scope of the responsibilities delegated to the Committee as it deems appropriate, including the authority to request any officer, employee or advisor of the Company to meet with the Committee or any advisors engaged by the Committee.

74.     Under the subheading titled "Responsibilities", in a section titled "Annual Financial Statements and Annual Audit," the Audit Committee Charter states:

1. *Meetings with Management, the Independent Registered Public Accounting Firm and the Internal Auditor.* The Committee will:

a) Meet with management, the independent registered public accounting firm and the internal auditor in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit.

b) Review and discuss with management and the independent registered public accounting firm: (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (ii) any analyses prepared by management or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative treatments of financial information within GAAP on the Company's financial

statements; and (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

c) Review and discuss the annual audited financial statements with management and the independent registered public accounting firm, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

2. *Separate Meetings with the Independent Registered Public Accounting Firm.* The Committee will:

a) Review with the independent registered public accounting firm any problems or difficulties the independent registered public accounting firm may have encountered during the course of the audit work, including any restrictions on the scope of activities or access to required information or any significant disagreements with management and management's responses to such matters. Among the items that the Committee should consider reviewing with the independent registered public accounting firm are: (i) any accounting adjustments that were noted or proposed by the independent registered public accounting firm but were "passed" (as immaterial or otherwise); (ii) any communications between the audit team and the independent registered public accounting firm's 6 national office respecting auditing or accounting issues presented by the engagement; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Company. The Committee will obtain from the independent registered public accounting firm assurances that Section 10A(b) of the Securities Exchange Act of 1934, as amended, has not been implicated. The review should also include discussion of the responsibilities, budget and staffing of the Company's internal audit function.

b) Discuss with the independent registered public accounting firm the report that such firm is required to make to the Committee regarding: (i) all accounting policies and practices to be used that the independent registered public accounting firm identifies as critical; (ii) all alternative treatments of financial information within GAAP for policies and practices related to material items that have been discussed among management and the independent registered public accounting firm, including the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm; and (iii) all other material written communications between the independent registered public accounting firm and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal control over financial reporting, the independent registered public accounting firm's engagement letter, the independent registered public accounting firm's independence letter, schedule of unadjusted audit differences and a listing of adjustments and classifications not recorded, if any.

c) Discuss with the independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16 as then in effect.

3. *Recommendation to Include Financial Statements in Annual Report.* The Committee will, based on the review and discussions in paragraphs 1(c) and 2(c) of this "Annual Financial Statements and Annual Audit" Section, and based on the disclosures received from the independent registered public accounting firm regarding its independence and discussions with representatives of the firm regarding such independence pursuant to subparagraph 3(b) of the "Interaction with the Independent Registered Public Accounting Firm" Section, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

75.    Under the same subheading, in a section titled "Quarterly Financial Statements,"

the Audit Committee Charter states:

Meetings with Management and the Independent Registered Public Accounting Firm. The Committee will review and discuss the quarterly financial statements with management and the independent registered public accounting firm, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

76.    Under the same subheading, in a section titled "Other Powers and

Responsibilities," the Audit Committee Charter states in relevant part:

1. The Committee will review with management and the independent registered public accounting firm the Company's earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be in general terms (i.e., discussion of the types of information to be disclosed and the types of presentations to be made).

*** 

3. The Committee will discuss with management and the independent registered public accounting firm any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function.

***

5. The Committee will meet separately with management on a periodic basis to discuss matters related to the Company's internal control over financial reporting and other matters related to the Company's internal audit function.

6. Once required, the Committee will review and discuss with management and the independent registered public accounting firm the Company's report on internal control over financial reporting prior to filing the Company's Annual Report on Form 10-K.

7. The Committee will discuss with management the Company's guidelines and policies with respect to risk assessment and risk management. In addition, the Committee will discuss with management the Company's significant financial risk exposures and the actions management has taken to monitor and control such exposures.

*** 

11. The Committee will prepare for inclusion in the Company's proxy statement for its annual meeting of stockholders the report required by the rules of the Securities and Exchange Commission.

*** 

15. The Committee will review disclosures by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10- Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein.

77.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the

accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Company Background

78.     Solaris is a Houston-based company which provides mobile and scalable equipment-based solutions for use in power generation as well as the management of raw materials used in the completion of oil and natural gas wells throughout the United States. Solaris currently focuses on providing its services for the energy, data center, and other commercial and industrial sectors.

79.     Prior to the MER acquisition Solaris went by the name Solaris Oilfield Infrastructure, Inc. ("Solaris Oilfield Infrastructure") and designed and manufactured specialized equipment, which combined with field technician support, logistics and software solutions, enabled Solaris Oilfield Infrastructure to drive efficiencies and reduce operational footprints for oil and gas operators.

80.     Following the MER acquisition on September 11, 2024, the Company was renamed to Solaris Energy Infrastructure, Inc. and divided the Company into two operating segments: Solaris Power Solutions and Solaris Logistics Solutions. Solaris Power Solutions is the rebranded MER business and provides mobile power generation solutions through equipment lease agreements. Solaris Logistics Solutions is the rebranded legacy Solaris Oilfield Infrastructure business.

81.     Leading up to the Relevant Period, the Company's revenues were declining, as the

Company experienced five straight quarterly revenue declines from the third quarter of 2022 to the fourth quarter of 2024. The Company stated that the revenue declines were a result of "continued maturation" of its Logistics Solutions segment, which was the only segment the Company was operating during that time.

### False and Misleading Statements

#### July 9, 2024 Press Release

82.    On July 9, 2024, the Company issued the July 9 Press Release titled "Solaris Announced Agreement to Acquire Mobile Energy Rentals; Announced Remaining to Solaris Energy Infrastructure; Issues Second Quarter Financial Updates," in which the MER acquisition was announced. The July 9 Press Release touted the value proposition of MER, stating that MER was equipped with an "***Experienced and alignment management team,***" with a "***long and successful track-record of managing power solutions***" which served a "***diverse set of -end-market and customers***." Specifically, the July 9 Press Release stated, in relevant part:

**Transaction Highlights and Strategy**

• **Scale, end-market diversity, and contractual profile:** Entry into critical distributed power infrastructure solutions provides access to multiple, high-growth end-markets; pro forma business mix expected to be >50% distributed power infrastructure, supported by a robust contract profile and a diverse set of end-markets and customers

• **Compelling valuation**: Initial purchase multiple of 4.0x run-rate contracted Adjusted EBITDA*; MER's third quarter 2024 Adjusted EBITDA is forecasted to be approximately $12 million - $13 million, representing annualized run-rate Adjusted EBITDA of approximately $50 million; majority of MER's asset base currently under contract with a leading provider of artificial intelligence computing solutions

• **Attractive capital redeployment opportunity**: MER's existing power generation asset base of 153 MW is currently fully-utilized; the fleet is expected to grow to 478 MW by the end of the third quarter of 2025** through the purchase of

additional mobile turbines for approximately $308 million and is expected to be deployed at similar return profiles across a diverse customer base

• **Experienced and aligned management team**: MER's founders and management team will be fully-integrated into Solaris post-closing, leveraging their long and successful track-record of managing power solutions across a range of end-markets; following the closing of the transaction, MER's founders and management will own, in aggregate, approximately 27% of Solaris' outstanding shares

• **Synergies with our business**: Operational synergies are available to the combined platform via Solaris' engineering, manufacturing, field service, commercial and corporate infrastructure

• **Committed to growing shareholder value**: Conservative pro forma financial profile, with <2.0x leverage* at closing on a run-rate basis with further deleveraging as new power generation equipment is placed into service; committed to maintaining the current $0.48/share annualized dividend, which has been paid for 23 consecutive quarters

• **Aligned ownership**: After the closing of the transaction, management, insiders and MER's founders and management team will collectively own >50% of Solaris' total outstanding shares, creating further alignment between Solaris and its shareholders

Founded in 2022 and based in Houston, Texas, MER provides configurable sets of primarily natural-gas powered mobile turbines and ancillary equipment to energy, data center and other C&I end-markets. MER's solutions provide reliable and cost-effective power where grid infrastructure may not be available or is unreliable.

***

**Q2 2024 Financial Update**

As of the date of this news release, Solaris has not finalized its financial results for the second quarter of 2024. However, based on preliminary information, Solaris expects second quarter revenue to be between $70 million and $75 million and Adjusted EBITDA to be between $20 million and $21 million for the second quarter of 2024. During the second quarter, Solaris repaid $14 million of debt, ending the quarter with $11 million of net debt.

***July 9, 2024 Investor Presentation***

83.    On the same day, the Company published an investor presentation further detailing

the MER acquisition (the "July 9 Investor Presentation"). The July 9 Investor Presentation continued to represent that MER was a "***premier provider of distributed power solutions***" and a "***compelling value creation opportunity***" for the Company. The July 9 Investor Presentation stated, in relevant part:



***



***November 2024 Earnings Press Release and Form 10-Q***

84.    On November 4, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q 2024 Earnings Press Release"). The 3Q 2024 Earnings Press Release highlighted Solaris' financial results as well as provided investors with an update regarding the MER acquisition.  The 3Q 2024 Earnings Press Release revealed that the MER acquisition was completed on September 11, 2024, and MER was rebranded to the Company's Power Solutions segment. The 3Q 2024 Earnings Press Release stated, in relevant part:

**Third Quarter 2024 Summary Results and Recent Highlights**

• Revenue of $75 million

• Net loss of $2 million and ($0.04) per diluted Class A share; Adjusted pro forma net income(1) of $4 million and $0.08 per fully diluted share

 • Adjusted EBITDA(1) of $22 million

• On September 11, 2024, closed the acquisition of Mobile Energy Rentals LLC ("MER," and such acquisition, the "MER Acquisition"), a premier provider of distributed power solutions; established new Solaris Power Solutions segment

• Closed $325 million senior secured term loan to effectuate the MER Acquisition and to support continued growth capital investment into the Solaris Power Solutions fleet

• Executed additional power service agreements with customers, totaling approximately 450 megawatts ("MW") of generation capacity, or greater than 80% of expected 2025 ending capacity (including all deliveries on order); contract tenor ranges from two to four years, providing the Company significant earnings visibility

• Returned a total of $5 million to shareholders in third quarter 2024 through dividends, resulting in $183 million cumulatively returned to shareholders since 2018

• Approved fourth quarter 2024 dividend of $0.12 per share on October 30, 2024, to be paid on December 16, 2024, to holders of record as of December 6, 2024 which, once paid, will represent Solaris' 25th consecutive dividend

"During the quarter, Solaris both announced and closed on a transformative acquisition, while continuing to deliver strong service quality for our customers across both business segments," Chairman and Chief Executive Officer Bill Zartler commented

"The commercial opportunity set for our Power Solutions segment is accelerating rapidly, further highlighting the demand for 'behind-the-meter' power generation applications across a variety of end markets. We are pleased to announce that since closing the acquisition we have signed several power service contracts at tenors ranging from two to four years, bringing our customer agreements to over 80% of our expected ending 2025 capacity. This is a testament to both the strong team we have in place, as well as the broad-based growth in electrification and artificial intelligence computing applications.

"Our Solaris Logistics Solutions segment continues to focus on technology advancements that drive efficiency gains and add value for our customers, which is evident in our leading market position within the Logistics Solutions segment and the continued adoption of our new technologies. We remain committed to the provision of exceptional service quality by leveraging our company culture and innovative technologies across both of our business segments. Together, the combined business provides a balanced and attractive financial profile that is also uniquely positioned to grow and drive total shareholder value."

85.    On November 7, 2024, the Company filed its Form 10-Q with the SEC for the third

quarter of 2024 (the "3Q 2024 Form 10-Q"), signed by Defendants Zartler and Ramachandran. Attached to the 3Q 2024 Form 10-Q were certifications by Defendants Zartler and Ramachandran made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") certifying that the 3Q 2024 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [3Q 2024 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

86.     The 3Q 2024 Form 10-Q revealed that Solaris had paid $60 million in cash consideration, approximately 16.5 million in Solaris shares, and repayment of approximately $71 million in MER's debt in connection with the acquisition. The 3Q 2024 Form 10-Q further revealed that the acquisitions' fair value of total purchase consideration was $323.1 million, consisting of $186.4 million associated with the issuance of approximately 16.5 million shares of Solaris common stock, $77.1 million associated with cash paid for capital expenditures reimbursement, $44.9 million in initial cash consideration, and $14.7 million paid for MER's closing cash balance. The 3Q 2024 Form 10-Q additionally stated that the Company held $306.395 million in net property, plant and equipment and $939.487 million in total assets. Further, the 3Q 2024 Form 10-Q stated that the assumed useful life of the Company's turbine equipment held for lease was "25 years." Additionally, 3Q 2024 Form 10-Q continued to tout MER's value proposition, stating in relevant part:

| | September 30, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 18,634 | $ 5,833 |
| Restricted cash | 97,907 | — |
| Accounts receivable, net of allowances for credit losses of $681 and $104, respectively | 50,321 | 44,916 |
| Accounts receivable - related party | 6,444 | 2,378 |
| Other receivables | 6,502 | — |
| Prepaid expenses and other current assets | 6,059 | 4,342 |
| Inventories | 11,165 | 6,672 |
| Assets held for sale | — | 3,000 |
| Total current assets | 197,032 | 67,141 |
| Property, plant and equipment, net | 306,395 | 325,121 |
| Equipment held for lease, net | 212,664 | — |
| Non-current inventories | 1,635 | 1,593 |
| Non-current receivables, net of allowances of $654 and $862, respectively | 1,069 | 1,663 |
| Operating lease right-of-use assets | 10,087 | 10,721 |
| Goodwill | 101,007 | 13,004 |
| Intangible assets, net | 73,698 | 702 |
| Deferred tax assets | 34,504 | 48,010 |
| Other assets | 1,396 | 342 |
| Total assets | $ 939,487 | $ 468,297 |

\*\*\*

Solaris Power Solutions, recently established following the acquisition of Mobile Energy Rentals LLC ("MER"), provides mobile power generation solutions through equipment lease arrangements. On September 11, 2024, Solaris, through its subsidiary Solaris Energy Infrastructure, LLC ("Solaris LLC"), completed the acquisition of MER. ***MER operates throughout the United States, providing configurable sets of primarily natural gas-powered mobile turbines and ancillary equipment to energy, data center, and other commercial and industrial end-markets. This acquisition provided Solaris entry into the large and growing distributed power solutions market, both enhancing our position as a mobile equipment and logistics solution provider to the oil and gas industry and also diversifying our end market exposure.***

\*\*\*

On September 11, 2024, we completed the acquisition of 100% of the outstanding equity interests in MER, in accordance with the contribution agreement dated July 9, 2024 (the "MER Acquisition"). ***The integration of our legacy business with MER's operations is expected to enhance our capabilities in providing mobile, configurable equipment solutions and logistics services to our customers across various industries.***

The MER Acquisition was accounted for using the acquisition method of accounting for business combinations. ***The fair value of the total purchase consideration transferred was $323.1 million***, consisting of the following amounts:

| | | Amount |
|---|---|---|
| Issuance of 16,464,778 Solaris LLC units and an equal number of Class B Common Stock (the "equity consideration") | $ | 186.4 |
| Cash Paid for Capital Expenditures Reimbursement | | 77.1 |
| Initial Cash Consideration (net of initial working capital adjustments) | | 44.9 |
| Cash Paid for MER's Closing Cash Balance | | 14.7 |
| Fair Value of Total Purchase Consideration Transferred | $ | 323.1 |

***

The table below outlines our preliminary allocation of the ***total purchase consideration to the identifiable assets*** acquired and liabilities assumed, based on their fair values at the acquisition closing date.

| | | Amount |
|---|---|---|
| Cash | $ | 14.7 |
| Accounts receivable | | 7.5 |
| Inventories | | 2.5 |
| Prepaid expenses and other current assets | | 0.1 |
| Property and equipment and equipment held for lease | | 158.7 |
| Operating lease right-of-use assets | | 0.4 |
| Intangible assets - customer relationships (1) | | 65.9 |
| Intangible assets - trademarks (2) | | 8.0 |
| Total assets acquired | $ | 257.8 |
| | | |
| Accounts payable | $ | 5.0 |
| Accrued liabilities | | 0.7 |
| Deferred revenue | | 11.9 |
| Operating lease liabilities | | 0.4 |
| Finance lease liabilities | | 0.2 |
| Deferred tax liabilities | | 4.5 |
| Total liabilities assumed | $ | 22.7 |
| | | |
| Net assets acquired | | 235.1 |
| | | |
| Goodwill | $ | 88.0 |

(1) Customer relationships are being amortized over a 10-year life.
(2) Trademarks are being amortized over a 5-year life.

***The fair value of the acquired property and equipment and equipment held for lease was determined using both cost and market approaches***. The cost approach was primarily employed, which involved estimating the replacement cost of the assets and adjusting this amount for their age, condition and utility. The market approach was also considered, analyzing recent transactions of comparable property and equipment to establish a fair market value. ***The valuation methods used to determine the estimated fair value of identifiable intangible assets included the multi-period excess earnings method for customer relationships and the relief from royalty method for trademarks.*** Several significant assumptions were involved in the application of these valuation methods, including forecasted sales volumes and prices, royalty rates, contributory asset charges, discount rates and estimated useful lives of the intangible assets. These identifiable intangible assets have finite lives and are subject to amortization over their estimated useful

- 40 -

lives.

***The value assigned to goodwill in connection with the business combination is $88.0 million. This goodwill has been allocated to our Solaris Power Solutions segment and represents the excess of the purchase price over the fair value of identifiable net assets acquired, reflecting the assembled workforce and expected growth opportunities available to us resulting from the MER Acquisition***. The amount of goodwill deductible for tax purposes is $18.5 million. Additionally, goodwill was increased by the deferred tax liability associated with the fair market value exceeding the tax basis of the acquired assets. Goodwill is not subject to amortization but is tested for impairment annually, or more frequently if indicators of impairment arise.

*\*\*\**

| | September 30, 2024 | | December 31, 2023 |
|---|---|---|---|
| Segment assets: | | | |
| Solaris Logistics Solutions | $ | 381.6 | $ 401.1 |
| Solaris Power Solutions | | 392.3 | — |
| Total segment assets | $ | 773.9 | $ 401.1 |
| Corporate assets | | 165.6 | 67.2 |
| Consolidated assets | $ | 939.5 | $ 468.3 |

*\*\*\**

## (f) Property, plant and equipment and equipment held for lease

Property, plant and equipment and equipment held for sale are stated at cost or fair value for assets acquired in a business combination, less accumulated depreciation. Depreciation is primarily calculated using the straight-line method over the estimated useful lives of the assets. Certain assets classified under Power Generation – Ancillary Equipment are depreciated using the units of production method.

| | Useful Life |
|---|---|
| **Equipment held for lease** | |
| Power Generation - Turbine | 25 years |
| Power Generation - Ancillary Equipment | 3 - 20 years |
| | |
| **Property, plant and equipment** | |
| Oil and gas logistics equipment | Up to 15 years |
| Machinery and equipment | 3 - 12 years |
| Furniture and fixtures | 5 years |
| Computer hardware and software | 3 - 10 years |
| Vehicles | 5 years |
| Buildings and leasehold improvements | 15 years |

Expenses for maintenance and repairs are charged to operations as incurred, while

- 41 -

betterments that increase the value or significantly extend the life of the related assets are capitalized.

Property, plant and equipment and equipment held for lease are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Recoverability is assessed by comparing the carrying amount of the asset to its estimated undiscounted future cash flows. If the carrying amount exceeds the estimated future cash flows, an impairment charge is recognized for the amount by which the carrying amount exceeds the asset's fair value.

***February 20, 2025 FY Earnings Press Release***

87.     On February 20, 2025, the Company issued a press release announcing its fourth quarter and full-year 2024 financial results (the "FY 2024 Earnings Press Release").  The FY 2024 Earnings Press Release continued to highlight the performance and value proposition of Solaris Power Solutions, stating in relevant part:

**Fourth Quarter 2024 Summary Results and Key Business Updates**

• **Revenue** – Revenue of $96 million increased 28% sequentially from the third quarter 2024 due to a full quarter of contribution from Solaris Power Solutions following the closing of the acquisition of Mobile Energy Rentals LLC ("MER," and such acquisition, the "MER Acquisition") on September 11, 2024, as well as continued activity growth within Solaris Power Solutions.

• **Profitability**

o Net income of $14 million and $0.19 per diluted Class A share; Adjusted pro forma net income(1) of $7 million and $0.12 per fully diluted share

o Total Adjusted EBITDA(1) of $37 million

• **Cash Flow and Capital Expenditures** – Net cash from operating activities was $13 million in the fourth quarter 2024, and capital expenditures were approximately $127 million, which primarily consisted of progress and delivery payments for power equipment. Net cash used in investing activities was approximately $115 million.

• **Balance Sheet and Liquidity** – As of December 31, 2024, Solaris had $325 million in outstanding borrowings and $160 million in total cash, of which $46

million was restricted for certain growth capital expenditures. The yearend cash balance reflected the impact from the net proceeds of approximately $156 million from an underwritten public offering of 6.5 million shares of Class A common stock on December 11, 2024.

• **Power Solutions Growth Update** – Recently secured an additional 700 megawatts ("MW") of gas-powered turbines with majority of deliveries expected to occur throughout 2026, bringing Solaris' pro forma operated power fleet to approximately 1,400 MW by the first half of 2027. Total expected capital expenditures, including allowance for balance-of-plant and emissions control technology, associated with these orders(4) are estimated to be approximately $600 million.

*March 5, 2025 Form 10-K*

88.    On March 5, 2025, the Company filed its annual report on Form 10-K for the 2024 fiscal year with the SEC (the "2024 Form 10-K"), signed by Defendants Zartler, Ramachandran, Argo, Burke, Durrett, Giesinger, Keenan, Teague, and Walker. Attached to the 2024 Form 10-K were SOX certifications signed by Defendants Zartler and Ramachandran certifying that the 2024 Form 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2024 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

89.    The 2024 Form 10-K represented that the Company held $298.828 million in net property, plant, and equipment and $1.123 billion in total assets.

90.    The 2024 Form 10-K repeated the same false and misleading statements from the 3Q 2024 Form 10-Q contained in ¶86 regarding the fair value of the MER acquisition.

91.    Specifically, the 2024 Form 10-K stated, in relevant part:

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 114,255 | $ 5,833 |
| Restricted cash | 45,612 | — |
| Accounts receivable, net of allowances of $681 and $104, respectively | 71,774 | 44,916 |
| Accounts receivable - related party | — | 2,378 |
| Prepaid expenses and other current assets | 8,387 | 4,342 |
| Inventories | 10,948 | 6,672 |
| Assets held for sale | — | 3,000 |
| Total current assets | 250,976 | 67,141 |
| Property, plant and equipment, net | 298,828 | 325,121 |
| Equipment held for lease, net | 339,932 | — |
| Non-current inventories | 1,693 | 1,593 |
| Non-current receivables, net of allowance of $654 and $862, respectively | 1,069 | 1,663 |
| Operating lease right-of-use assets | 9,966 | 10,721 |
| Goodwill | 103,985 | 13,004 |
| Intangible assets, net | 71,521 | 702 |
| Deferred tax assets, net | 43,574 | 48,010 |
| Other assets | 1,337 | 342 |
| Total assets | $ 1,122,881 | $ 468,297 |

\*\*\*

On September 11, 2024, Solaris, through its subsidiary Solaris Energy Infrastructure, LLC ("Solaris LLC"), completed the acquisition of Mobile Energy Rentals LLC ("MER"). ***MER operates throughout the United States, providing configurable sets of primarily natural gas-powered mobile turbines and ancillary equipment to energy, data center, and other commercial and industrial end-markets. This acquisition provided Solaris with an entry into the large and growing distributed power solutions market, both enhancing our position as a mobile equipment and logistics solution provider to the oil and gas industry and also diversifying our end market exposure.***

\*\*\*

On September 11, 2024, we completed the acquisition of 100% of the outstanding equity interests in MER, in accordance with the contribution agreement dated July 9, 2024 (the "MER Acquisition"). Since the completion of the MER Acquisition, we have made significant progress in integrating our legacy business with MER's operations, enhancing our capabilities in providing mobile, configurable equipment solutions and logistics services to our customers across various industries.

The MER Acquisition was accounted for using the acquisition method of accounting for business combinations. ***The fair value of the total purchase consideration transferred was $323.1 million, consisting of the following amounts***:

- 44 -

| | | Amount |
|---|---|---|
| Issuance of 16,464,778 Solaris LLC units and an equal number of Class B Common Stock (the "equity consideration") | $ | 186.4 |
| Cash Paid for Capital Expenditures Reimbursement | | 77.1 |
| Cash Consideration (net of working capital adjustments) | | 44.9 |
| Cash Paid for MER's Closing Cash Balance | | 14.7 |
| Fair Value of Total Purchase Consideration Transferred | $ | 323.1 |

*** 

The table below outlines our preliminary allocation of the ***total purchase consideration to the identifiable assets acquired and liabilities assumed, based on their fair values at the acquisition date.***

| | | Amount |
|---|---|---|
| Cash | $ | 14.7 |
| Accounts receivable | | 7.5 |
| Inventories | | 2.5 |
| Prepaid expenses and other current assets | | 0.1 |
| Property and equipment and equipment held for lease | | 158.7 |
| Operating lease right-of-use assets | | 0.4 |
| Intangible assets - customer relationships (1) | | 65.9 |
| Intangible assets - trademarks (2) | | 8.0 |
| Total assets acquired | $ | 257.8 |
| | | |
| Accounts payable | $ | 5.0 |
| Accrued liabilities | | 0.7 |
| Deferred revenue | | 11.9 |
| Operating lease liabilities | | 0.4 |
| Finance lease liabilities | | 0.2 |
| Deferred tax liabilities (3) | | 7.5 |
| Total liabilities assumed | $ | 25.7 |
| | | |
| Net assets acquired | | 232.1 |
| | | |
| Goodwill | $ | 91.0 |

(1) Customer relationships are being amortized over a weighted average period of 9.3 years.
(2) Trademarks are being amortized over a weighted average period of 5 years.
(3) In the fourth quarter of 2024, a measurement period adjustment was made to increase deferred tax liabilities by $3.0 million related to the acquired long-lived tangible assets, with a corresponding increase to goodwill.

***The fair value of the acquired property and equipment and equipment held for lease was determined using both cost and market approaches***. The cost approach was primarily employed, which involved estimating the replacement cost of the assets and adjusting this amount for their age, condition and utility. The market approach was also considered, analyzing recent transactions of comparable property and equipment to establish a fair market value. ***The valuation methods used to determine the estimated fair value of identifiable intangible assets included the multi-period excess earnings method for customer relationships and the relief from royalty method for trademarks***. Several significant assumptions were involved in the application of these valuation methods, including revenue growth rate, royalty rates, contributory asset charges, probability of renewal curves,

discount rates and estimated useful lives of the intangible assets. These identifiable intangible assets have finite lives and are subject to amortization over their estimated useful lives.

***The value assigned to goodwill in connection with the business combination is $91.0 million. This goodwill has been allocated to our Solaris Power Solutions segment and represents the excess of the purchase price over the fair value of identifiable net assets acquired, reflecting the assembled workforce and expected growth opportunities available to us resulting from the MER Acquisition.*** The amount of goodwill deductible for tax purposes is $13.1 million. Additionally, goodwill was increased by the deferred tax liability associated with the fair market value exceeding the tax basis of the acquired assets. Goodwill is not subject to amortization but is tested for impairment annually, or more frequently if indicators of impairment arise.

***

| | December 31, | | | |
|---|---|---|---|---|
| | 2024 | | 2023 | |
| Segment assets: | | | | |
| Solaris Logistics Solutions | $ | 371.7 | $ | 401.1 |
| Solaris Power Solutions | | 535.3 | | — |
| Total segment assets (1) | $ | 907.0 | $ | 401.1 |
| Corporate assets (2) | | 215.9 | | 67.2 |
| Consolidated assets | $ | 1,122.9 | $ | 468.3 |

    (1)  Segment assets consist of accounts receivable, prepaid assets, inventories, goodwill and long-lived assets.

    (2)  Corporate assets consist of cash and cash equivalents, restricted cash, prepaid expenses, deferred tax assets and other assets.

***

## Property, Plant and Equipment and Equipment Held for Lease

Property, plant and equipment, as well as equipment held for lease, are initially recorded at cost, except for assets acquired in a business combination, which are recorded at fair value on the acquisition date. At period-end, these assets are reported at their initial measurement (whether at cost or fair value) less accumulated depreciation. Depreciation is primarily calculated using the straight-line method over the estimated useful lives of the assets. Certain assets classified under Power Generation – Ancillary Equipment are depreciated using the units of production method. We also capitalize interest on borrowings directly attributable to the acquisition or construction of certain capital assets. The capitalized interest is included in the cost of the asset and is subsequently depreciated over its estimated useful life.

| | Useful Life |
|---|---|
| **Equipment held for lease** | |
| Power Generation - Turbine | 25 years |
| Power Generation - Ancillary Equipment | 3 - 20 years |
| | |
| **Property, plant and equipment** | |
| Oil and gas logistics equipment | 5 - 15 years |
| Machinery and equipment | 3 - 12 years |
| Furniture and fixtures | 5 years |
| Computer hardware and software | 3 - 10 years |
| Vehicles | 5 years |
| Buildings and leasehold improvements | 15 years |

Expenses for maintenance and repairs are charged to operations as incurred, while betterments that increase the value or significantly extend the life of the related assets are capitalized. When assets are sold or disposed of, the related cost and accumulated depreciation are removed from the consolidated balance sheets, and any resulting gain or loss is recognized in the consolidated statement of operations.

Property, plant and equipment and equipment held for lease are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Recoverability is assessed by comparing the carrying amount of the asset to its estimated undiscounted future cash flows. If the carrying amount exceeds the estimated future cash flows, an impairment charge is recognized for the amount by which the carrying amount exceeds the asset's fair value.

92.     The statements in ¶¶ 82-91 above were materially false and misleading because they failed to disclose, *inter alia*, that: (1) MER's experience and track record in the turbine leasing sector were overstated; (2) one of MER's co-owners was embroiled in numerous controversies, including turbine-related fraud and a felony conviction for environmental crimes; (3) MER's minimal clientele limited its value proposition to Solaris; (4) as a result, Solaris overstated the commercial prospects of the MER acquisition; and (5) Solaris overstated its total assets and near term profitability on its financial reports due to the failure to properly deprecate MER's turbines in accordance with industry standards. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**The Truth Emerges**

***March 17, 2025 Morpheus Research Report***

93.     On March 17, 2025, Morpheus Research published the Morpheus Research Report. The Morpheus Research Report revealed that despite assurances from Defendant Zartler stating that he had known MER's management team "for a long time" and that he believed "the cultural and operational fit" between the two businesses was "highly complementary," Tuma was in fact a convicted felon for lying under oath and environmental crimes. Further, at a prior company Tuma was involved in a $800 million bid rigging scandal involving gas turbines. Specifically, the Morpheus Research Report stated:

> **Solaris CEO Bill Zartler Told Shareholders That He Has Known MER's Management Team "For A Long Time" And That He Believes "The Cultural And Operational Fit" Between The Two Businesses Is "Highly Complementary"**
>
> **MER's Management Team Includes John Tuma, Who Received A 5-Year Prison Sentence In 2012 After Being Convicted Of Environmental Crimes And Lying To The Court "On Multiple Occasions Under Oath"**
>
> **Today, Tuma Owns 12% Of Solaris' Shares And Is Employed At Solaris As A "Senior Technical Advisor"**
>
> ***
>
> While Solaris' CEO told shareholders that he has known MER's management for a "long time," he failed to disclose that Tuma has a track record of fraud and corruption. As one industry consultant told us, Tuma has a reputation of not being a "straight shooter":
>
> No, he's not a straight shooter. His reputation is not as a straight shooter. . . . I haven't seen anything personally, let me put it that way. . . . but his reputation was enough that I didn't want to have long-term dealings with him. . . . I would be much happier if he wasn't part of [Solaris] if I was investing my own money.
>
> In March 2012, Tuma was convicted by a federal jury for discharging an estimated 200,000 gallons a day of hazardous wastewater directly into Louisiana's Red River.

- 48 -

According to the U.S. Department of Justice, he was sentenced to 5 years in prison, followed by a 3-year probation and a $100,000 fine:

**Shreveport, La., Wastewater General Manager and Former Owner Sentenced to Five Years in Prison for Discharging Pollutants into the Red River**

(Source: DOJ)

Specifically, the indictment alleged that Tuma was directly responsible both for instructing employees to bypass environmental monitoring systems and attempting to obstruct the EPA investigation.

Moreover, the Court found (emphasis added) that Tuma "was untruthful at trial with respect to material matters in [the] case. Specifically, Mr. Tuma lied on multiple occasions under oath about intentionally discharging untreated wastewater to the City of Shreveport and the Red River." That transgression led the Court to increase the severity of Tuma sentence, according to the Court's opinion. [Pgs. 81-82]

Tuma was released from prison in April 2017, according to the Federal Bureau of Prisons.

**Solaris Told Its Shareholders That MER's Management Had A "Long And Successful Track-Record Of Managing Power Solutions"**

**After His Release From Prison, Tuma Founded Life Cycle Power, Which Was At The Center Of An $800-Million Gas Turbines Scandal In Houston That Included Allegations Of Bid Rigging, Corruption, And The Inability To Deliver The Promised Number Of Turbines**

**Ross Bartley, Now Solaris' EVP Of Power Solutions, Worked Alongside Tuma As Life Cycle Power's CFO**

94.     The Morpheus Research Report additionally revealed that despite claims to investors that MER was a "premier provider of distributed power solutions serving the energy and commercial & industrial end-markets" with an "experienced and aligned management team," MER had in fact only acquired its turbines in the months leading up to the acquisition. As revealed in the Morpheus Research Report, MER did not have any employees at the time of its acquisition,

- 49 -

and its contact address was a residential condominium in Houston. The Morpheus Research Report further alleged that Tuma was able to circumvent creditworthiness issues by joining MER. Specifically, the Morpheus Research Report stated:

> **Part II: How Tuma, A Convicted Felon, And His Partner Parlayed $54.7 Million Of Turbines Into $460 Million In Cash And Stock From Solaris**
>
> Tuma's felony convictions limited his ability to access financing, according to a former Sales Manager of a gas turbine OEM who interacted with him after his release from prison. He told us that:
>
> It was really hard for us at [redacted OEM name] to sell him anything because we couldn't get him financed because of his conviction.
>
> Tuma was able to circumvent his lack of creditworthiness by joining MER, a small local equipment leasing business founded by Johnson just 2 years earlier.
>
> **At The Time Of The Acquisition, Solaris Described MER As A "Premier Provider Of Distributed Power" That Provided "Natural-Gas Powered Mobile Turbines" With A Unique And Successful Team**
>
> **Reality Check: As Of 2023, MER Was A ~$2.5 Million Revenue Equipment Leasing Business Based Out Of A Condo With Zero Employees And No Turbine Assets**
>
> ***
>
> MER appears, however, to have been little more than a shell company that didn't own a single mobile turbine by the end of Q1 2024, according to its financial statements. MER reported just $2.46 million in revenue in 2023, primarily from leasing switchgear equipment rather than deploying mobile turbines. The company had total equity of just $5.3 million at the end of that year.
>
> Furthermore, Solaris' proxy statement revealed that MER had no employees at the time of its acquisition by the Company and, in fact, never had any.
>
> After Solaris announced the acquisition in July 2024, MER listed its "contact" and "principal executive office" address as 2929 Buffalo Speedway, Suite A1024, Houston, Texas, per an archived version of its website from August 1, 2024, and a proxy statement filed by Solaris:



(Website Archive August 1, 2024, Source: *WaybackMachine*)

This 2929 Buffalo Speedway address is a high-rise residential building in Houston, Texas, with unit number "A1204" being a 3-bedroom condo. The property is owned by Johnson's son, Sean G. Johnson[.]

95.    The Morpheus Research Report would continue to reveal that "despite appearing as nothing more than a small, local switchgear rental business at the end of 2023, MER's business seemingly transformed throughout the first half of 2024 – just months before it was acquired by Solaris." The Morpheus Research Report stated that in the months leading up to the acquisition, MER had acquired substantially all of its turbines by financing through the $71 million in debt that Solaris would later pay in the acquisition, stating:

> **MER Transformed In The First Half Of 2024 – Winning Its First Data Center Contract, Securing A 153MW Fleet Of Turbines, And Placing Orders For New Turbines**
>
> **The Turbines And Deposits For New Turbines Were Covered Through $71 Million In Debt Financing And A $54.7 Million "Property & Equipment" Contribution From Tuma & His Affiliates, Per An Industry Expert**
>
> **The $71-Million Debt Was Paid Down By Solaris**
>
> Despite appearing as nothing more than a small, local switchgear rental business at the end of 2023, MER's business seemingly transformed throughout the first half of 2024 – just months before it was acquired by Solaris.
>
> By March 2024, MER had entered into a revenue contract with a data center worth $39 million that represented 16x its previous year revenue, according to its financial statements.[9]
>
> By June 30, 2024, MER had come into possession of $88.6 million worth of turbines, with another $42.3 million of new turbines on order, accounted for as

"construction in progress," according to its financial statements:[10]

**MER's Property And Equipment, As of March 31, 2024**
**Showing No Turbines**

| | March 31, 2024 | December 31, 2023 |
|---|---|---|
| Switchgear equipment | $4,506,500 | $4,506,500 |
| Trailers | 87,000 | 87,000 |
| Other ancillary equipment | 127,500 | 127,500 |
| Total property and equipment | 4,721,000 | 4,721,000 |
| Less: accumulated depreciation | (930,296) | (813,996) |
| | $3,790,704 | $3,907,004 |

**MER's Property And Equipment, As of June 30, 2024**
**Showing $88 Million Worth Of Turbines And $42 Million Worth Of Deposits**

| | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Turbines | $ 88,686,000 | $ — |
| Switchgear equipment | 4,506,500 | 4,506,500 |
| Trailers | 222,120 | 87,000 |
| Other ancillary equipment | 869,400 | 127,500 |
| Finance lease assets | 314,198 | |
| Construction in progress | 42,312,000 | — |
| Total property and equipment | 136,910,218 | 4,721,000 |

(Source: MER financial statements as of March 31, 2024 and June 30, 2024)

MER received some of these turbines via a $54.7 million "property and equipment" contribution from one of its owners. The remaining ~$71 million was financed through debt, according to MER financial statements as of June 30, 2024.[11]



| | | |
|---|---|---|
| Cash flows from financing activity: | | |
| Distributions to members | (1,000,000) | — |
| Net cash used in financing activity | (1,000,000) | — |
| Net change in cash | 1,988,975 | 970,912 |
| Cash, beginning of period | 943,275 | 583,014 |
| **Cash, End of Period** | **$ 2,932,250** | **$1,553,926** |
| Non-cash operating, financing and investing activities: | | |
| Right-of-use assets acquired from operating lease | $ 413,627 | $ — |
| Right-of-use assets acquired from finance lease | 314,198 | — |
| Property and equipment accrued in accounts payable | 33,669,855 | |
| Additions to property and equipment through contributions from members  $70.7 million | 54,700,000 | |
| Additions to property and equipment paid by members through related party debt | 37,102,000 | — |

(Source: ME's Cash Flow Statement for 1H 2024)

The $54.7 million contribution from one of MER's owner mirrors the value of Tuma's pay out from Goldfinch, suggesting that Tuma may have used his payout from LCP to acquire more turbines and contribute them to MER.

An industry expert familiar with the deal told us that Tuma had gotten a "settlement" from LCP and that he plunged "all the money into an order" for more turbines.

At acquisition, Solaris paid down all of MER's $71 million debt from its initial acquisition of turbines, according to a current report filed by Solaris on September 17, 2024. This indicates that Tuma and his partner's primary contribution to the

business was $54.7 million worth of turbines, as well as ~$5 million in assets from the legacy MER business.[12] (1, 2)

96.     The Morpheus Research Report would further detail how despite assurances to investors that MER had a "contracted and diversified earnings stream," MER had in fact only one data center customer, stating

**At Acquisition, Solaris Paid Tuma And His Affiliate $60 Million In Cash And ~16.5 Million Shares, Worth ~$186 Million At Closing And Approximately $400 Million Today**

**Ultimately, Solaris Doubled Its Leverage To Pay 3.19x Book Value For A Commoditized Business With One Data Center Customer**

Solaris' acquisition of MER resulted in a significant windfall for Tuma and Johnson, the only two members of MER at the time the acquisition was announced.

Solaris paid $60 million in cash and 16.46 million shares – worth $186.4 million at the time of closing and closer to approximately $400 million as of the date of this report. The price paid significantly outweighs the value of the assets acquired, especially considering that Solaris immediately depreciated MER's assets by ~$10.6 million upon acquisition.[13]

Solaris effectively doubled its leverage to acquire MER. Furthermore, the Company paid a rich book-value multiple of 3.19x for a business that offered little to no differentiation from its competitors. All this for a single data center relationship.[14]

97.     The Morpheus Research Report additionally detailed how Solaris appeared to "have inflated short term profitability through basic accounting games" including "depreciating its gas turbines assuming they have a useful life of 25 years" when competitors operating similar turbines had estimated a useful life of approximately 8.5 years.

**Solaris Depreciates Its Turbines Assuming They Have A Useful Life Of 25 Years — Inflating Short-Term Profitability**

**The Founder Of A Solaris Competitor Told Us His Company Was Modeling A Maximum Of 2.5 Overhauls For Turbines And Generators, Implying A Maximum Useful Life Of ~10 Years For Gas Turbines**

**Aggreko, A Direct Competitor Of Solaris, Depreciates Its Equipment Over A Maximum Of 12 Years**

An easy way for a capital-intensive business to inflate its current period profitability is to extend the useful life of assets beyond that of peers and industry norms in order to lower yearly depreciation rates — as it seems Solaris is doing by choosing a 25-year useful life for its turbines and straight line depreciation method, according to its most recent annual report.

Given that Solaris' turbines need extensive overhaul at least every 4 years, costing up to ~50% of the unit cost, the Company might have to spend more than the unit cost after 2 overhauls. In line with that assessment, the founder of a Solaris competitor with a fleet of gas turbines and generators told us that his Company was modeling for 2.5 overhauls as the maximum for its turbines or generators:

What we put into our model is, is, you know, we split the baby and then call it 2.5 [overhauls] on average in the aggregate.

Factoring in 2.5 overhauls, Solaris' turbines should have a useful life of around 10 years. At the very least, we can see no justification for the claim of a 25-year lifespan.

Solaris' accounting treatment also appears vastly out of line with global peers. For instance, Aggreko, a business specializing in "rental solutions covering power generation," just as Solaris does, contrasts starkly in determining the useful life of its rental fleet.

By the end of 2020, Aggreko owned a fleet with a total capacity to generate 9,365 MW— including a 1,357 MW capacity from gas engines, according to its 2020 annual report. [20]

Aggreko disclosed an 8-12 year useful life range for its entire rental fleet:

**Property, plant and equipment**

Our rental fleet accounts for £793 million, which is around 80% of the net book value of the Group's property, plant and equipment. The majority of equipment in the rental fleet is depreciated on a straight-line basis to a residual value of zero over eight years, with some classes of rental fleet depreciated over 10 and 12 years. The annual fleet depreciation charge of £227 million (2019: £265 million) reflects the estimated service lives allocated to each class of fleet asset. Asset lives are reviewed at the start of each year and changed, if necessary, to reflect their remaining lives in light of technological change, prospective economic utilisation and the physical condition of the assets. As noted on page 25 the Group incurred a net impairment charge of £55 million on total property, plant & equipment. This is explained in Note 7 to the Accounts.

(Source: Agrekko Annual Report, 2020)

This figure is less than half the useful life claimed by Solaris for its mobile gas turbines.

The disparity in how Solaris accounts for the useful life of its power generation units relative to peers suggests that the Company is doing so to inflate its near-term profitability.

**We Estimate That If Solaris Used An Adequate Depreciation Methodology, The Depreciation Charge Associated With Its Turbines Would Increase By ~108%**

We estimate that if Solaris used an adequate depreciation methodology, like its peer Aggreko, Solaris' depreciation expense associated with its turbine fleet would be ~108% higher than its current charge.[21]

In short, we believe Solaris has resorted to accounting machinations to materially inflate its short-term profitability.

98.     On this news, the price per share of Solaris' stock fell $4.15, or 16.9%, from a closing price of $24.61 per share on March 14, 2025 to close at a price of $20.46 per share on March 17, 2025.

<u>**REPURCHASES DURING THE RELEVANT PERIOD**</u>

99.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $10.2 million to repurchase approximately 300,197 shares of its own common stock at artificially inflated prices from November 2024 through March 2025.

100.     According to the 2024 Form 10-K, between November 1, 2024 and November 30, 2024, the Company repurchased 3,153 shares of its own common stock at an average price per share of approximately $20.86, for a total cost to the Company of approximately $65,771.58.

101.     As the Company's stock was actually worth only $20.46 per share, the price at

closing on March 17, 2025, the Company overpaid by approximately $1,261 for repurchases of its own stock between November 1, 2024 and November 30, 2024.

102.    According to the Form 10-Q filed on May 7, 2025 (the "1Q 2025 Form 10-Q"), between February 1, 2025 and February 28, 2025, the Company repurchased 93 shares of its own common stock at an average price per share of approximately $30.02, for a total cost to the Company of approximately $2,792.

103.    As the Company's stock was actually worth only $20.46 per share, the price at closing on March 17, 2025, the Company overpaid by approximately $889 for repurchases of its own stock between February 1, 2025 and February 28, 2025.

104.    According to 1Q 2025 Form 10-Q, between March 1, 2025 and March 31, 2025, the Company repurchased 296,951 shares of its own common stock at an average price per share of approximately $34.08, for a total cost to the Company of approximately $10,120,090.[2]

105.    As the Company's stock was actually worth only $20.46 per share, the price at closing on March 17, 2025, the Company overpaid by approximately $4,044,473 for repurchases of its own stock between March 1, 2025 and March 31, 2025.

## DAMAGES TO SOLARIS

106.    As a direct and proximate result of the Individual Defendants' conduct, Solaris has lost and expended, and will continue to lose and expend, many millions of dollars.

107.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

---

[2] Upon information and belief, these repurchases were made during the Relevant Period.

108.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

109.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

110.    As a direct and proximate result of the Individual Defendants' conduct, Solaris has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

111.    Plaintiff brings this action derivatively and for the benefit of Solaris to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Solaris, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

112.    Solaris is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

113.    Plaintiff is, and has been at all relevant times, a shareholder of Solaris. Plaintiff will adequately and fairly represent the interests of Solaris in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

114.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

115.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following ten individuals: Defendants Zartler, Argo, Burke, Durrett, Giesinger, Keenan, Teague, and Walker (the "Director-Defendants") and non-parties Amanda M. Brock and M. Max Yzaguirre (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors.

116.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

117.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

- 58 -

118.    Additional reasons that demand on Defendant Zartler is futile follow. Defendant Zartler is the Company's Co-CEO and has previously served as the Company's sole CEO from October 2017 through October 2025. The Company provides Defendant Zartler with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, Defendant Zartler is a non-independent director. As Solaris' Co-CEO and as one of its trusted directors, Defendant Zartler was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he personally signed such as the 3Q 2024 Form 10-Q, the 2024 Form 10-K, and the associated SOX certifications. As a trusted Company director and the Company's highest officer, Defendant Zartler conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Zartler's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Zartler is named as a defendant in the Securities Class Action. For these reasons, Defendant Zartler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand on Defendant Argo is futile follow. Defendant Argo has served as a Company director since March 2022. She currently serves as the Chair of the

Nominating and Governance Committee and as a member of the Audit Committee and the Compensation Committee. Defendant Argo has received and continued to receive lucrative compensation for her role as director. As a trusted Company director, she conducted little, if any, oversight of schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Argo signed the 2024 Form 10-K, which contained false and misleading statements. For these reasons, Defendant Argo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

120.    Additional reasons that demand on Defendant Burke is futile follow. Defendant Burke has served as a Company director since May 2017. He also currently serves as a member of the Nominating and Governance Committee. Defendant Burke has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Burke signed the 2024 Form 10-K, which contained false and misleading For these reasons, Defendant Burke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.    Additional reasons that demand on Defendant Durrett is futile follow. Defendant Durrett has served as a Company director since March 2019. She also currently serves as the

Company's Chief Administrative Officer. The Company provides Defendant Durrett with her principal occupation for which her receives lucrative compensation. Thus, as the Company admits, Defendant Durrett is a non-independent director. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. In addition, Defendant Durrett signed the 2024 Form 10-K, which contained false and misleading statements. Further, Defendant Durrett's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate her motive in facilitating and participating in the scheme. For these reasons, Defendant Durrett breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

122.    Additional reasons that demand on Defendant Giesinger is futile follow. Defendant Giesinger has served as a Company director since May 2017. He also currently serves the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. Defendant Giesinger has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Giesinger signed the 2024 Form 10-K, which contained false and misleading statements. For these reasons, Defendant Giesinger breached his fiduciary duties, faces a substantial likelihood of liability, is not

independent or disinterested, and thus demand upon him is futile and, therefore, excused.

123.    Additional reasons that demand on Defendant Keenan is futile follow. Defendant Keenan has served as a Company director since May 2017. Defendant Keenan has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Keenan signed the 2024 Form 10-K, which contained false and misleading statements. Further, Defendant Keenan's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Keenan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Teague is futile follow. Defendant Teague has served as a Company director since May 2017. He also currently serves a member of the Compensation Committee. Defendant Teague has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Teague signed the 2024 Form 10-K, which contained false and misleading statements. For these reasons, Defendant Teague breached his fiduciary duties, faces a substantial likelihood

of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.     Additional reasons that demand on Defendant Walker is futile follow. Defendant Walker has served as a Company director since August 2018. He also currently serves the Chair of the Compensation Committee. Defendant Walker has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Walker signed the 2024 Form 10-K, which contained false and misleading statements. For these reasons, Defendant Walker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.     Additional reasons that demand on the Board is futile follow.

127.     Defendants Giesinger (as Chair) and Argo (collectively the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their

risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

128.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the schemes to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Director-Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

129.    Solaris has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Solaris any part of the damages Solaris suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

130.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

131.    The acts complained of herein constitute violations of fiduciary duties owed by Solaris' officers and directors, and these acts are incapable of ratification.

132.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Solaris. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Solaris, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

133.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Solaris to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

134.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Section 10(b) and Rule 10b-5 of the Exchange Act

135.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Solaris. Not only is Solaris now defending claims that it had violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Solaris by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *300,197* of its own shares at artificially inflated prices, damaging Solaris.

137.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

138.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices

and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Solaris not misleading.

139.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even through such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

140.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

141.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.    The Individual Defendants, by virtue of their positions, with Solaris and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Solaris and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercise the same to cause Solaris to engage in the illegal conduct and practices

complained of herein.

143.    Plaintiff, on behalf of Solaris, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

144.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Solaris' business and affairs.

146.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

147.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Solaris.

148.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Solaris' business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) MER's experience and track record in the turbine leasing sector were overstated; (2) one of MER's co-owners was embroiled in numerous controversies, including turbine-related fraud and a felony conviction for environmental crimes; (3) MER's minimal clientele limited its value proposition to Solaris; (4) as a result, Solaris overstated the commercial prospects of the MER acquisition; and

- 68 -

(5) Solaris overstated its total assets and near term profitability on its financial reports due to the failure to properly deprecate MER's turbines in accordance with industry standards As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

149.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

150.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

151.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while four of the Individual Defendants engaged in improper insider sales, netting total proceeds of approximately *$27.9 million*.

152.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Solaris' securities.

The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

153.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

154.    As a direct and proximate result of the Individual's Defendants' breaches of their fiduciary obligations, Solaris has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

155.    Plaintiff, on behalf of Solaris, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

156.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Solaris.

158.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Solaris that was tied to the performance or artificially inflated valuation of Solaris, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

159.    Plaintiff, as a shareholder and representative of Solaris, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from

insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

160.    Plaintiff, on behalf of Solaris, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Abuse of Control

161.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Solaris, for which they are legally responsible.

163.    As a direct and proximate result of the Individual Defendants' abuse of control, Solaris has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Solaris has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164.    Plaintiff, on behalf of Solaris, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

165.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Solaris in a manner consistent with the operations

of a publicly held corporation.

167.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Solaris has sustained and will continue to sustain significant damages.

168.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

169.    Plaintiff, on behalf of Solaris, has no adequate remedy at law.

### SEVENTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

170.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Solaris to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

172.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

173.    Plaintiff, on behalf of Solaris, has no adequate remedy at law.

### EIGHTH CLAIM
**Against Defendants Zartler and Ramachandran for Contribution Under Sections 10(b) and 21D of the Exchange Act**

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    Solaris and Defendants Zartler and Ramachandran are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Zartler and Ramachandran's willful and/or reckless violations of their obligations as officers of Solaris.

176.    Defendants Zartler and Ramachandran, because of their positions of control and authority as officers of Solaris, were able to and did, directly, and/or indirectly, exercise control over the business and corporate affairs of Solaris, including the wrongful acts complained of herein and in the Securities Class Action.

177.    Accordingly, Defendants Zartler and Ramachandran are liable under 15 U.S.C § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act

178.    As such, Solaris is entitled to receive all appropriate contribution or indemnification from Defendants Zartler and Ramachandran.

## **REQUEST FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Solaris, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and

- 73 -

abetted the breach of their fiduciary duties to Solaris;

(c)     Determining and awarding to Solaris the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Solaris and the Individual Defendants to take all necessary actions to reform and improve Solaris' corporate governance and internal procedures to comply with applicable laws and to protect Solaris and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Solaris to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Solaris restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 24, 2025

**THE BROWN LAW FIRM, P.C.**

<u>*/s/ DRAFT*</u>
Saadia Hashmi
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: shashmi@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Yvens Saint-Phard, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29__ day of October, 2025.

Signed by:

*Yvens Saint-Phard*

C0C03289E367492

Yvens Saint-Phard